CEDARBURG FOX FARMS, INC., Respondent, vs. INDUSTRIAL COMMISSION, Appellant.

*November 12—December 8, 1942.*

*Stanley Rector* and *Albert D. Nohr,* both of Madison, for the appellant.

For the respondent there was a brief by *Schanen & Schanen* of Port Washington, attorneys, and *Charles F. Smith* of Wausau of counsel, and oral argument by *Mr. Smith* and *Mr. William F. Schanen.*

FRITZ, J.    The basic question is whether under the provisions of the Unemployment Compensation Act, ch. 108, Stats., which were in effect in 1934 to 1939, plaintiff's employees, engaged in its fox-farm operations, were exempted

from the act by sec. 108.02 (e), Stats. 1935, which, in con-
nection with defining "employment" and specifying coverage
under the act, provides,—

". . . except that for the purposes of this chapter an 'em-
ployment' shall not include: 1 Employment as a farm la-
borer; . . ."

At the times in question plaintiff was engaged in extensive
operations in the breeding and raising of silver foxes and the
sale of their pelts. For conducting its operations, it owned
and used three hundred sixty-four acres of land, consisting
of three former farms, with a residence and the usual farm
buildings on each farm. In addition to some farm ma-
chinery, there are three trucks, ten horses used for draft pur-
poses, and forty sheep which graze and keep the grass under
control in the spaces between the fox pens. Half of the land
is used directly in the raising of the foxes. The balance is
used for raising feed and grazing the draft horses and also
the horses which are killed for fox feed. There is a slaughter-
house fully equipped with machinery for handling horses
killed for feed, for drawing off the hides, and for chopping
and grinding the meat and bone; and also a two-thousand-
pound capacity feed mixer, and a five-thousand-pound ca-
pacity refrigerator for storing the fox feed, which consists
of horse meat, cereals, vegetables, and milk. A very small
portion of the feed is raised on the farm. Fifty-four thou-
sand eight hundred ninety-six dollars were expended by
plaintiff for feed in 1939. In 1934 there were about one
thousand pair of foxes on the farm, and since then the num-
ber has increased to nineteen hundred pair; and seven thou-
sand to eight thousand pups are raised each year. The foxes
are kept by pairs in separate pens inclosed by a wire fence,
and all are the thirty-fourth generation bred and kept in
captivity since 1905. Plaintiff has usually between ten and
twenty employees engaged in preparing the feed and feeding

and caring for the foxes, and doing other work around the place. They are rotated and shifted from one type of work to another, and may be called upon to do general farm work, and also to tend to the foxes. Their wages are somewhat higher than are paid for the ordinary farm work by farmers in the vicinity; and their employment is somewhat seasonal. When the foxes are to be pelted they are transported by trucks to a fox range in upper Michigan and allowed to run free in large inclosures. The ranges are owned by a different corporation and the proportionate cost is charged to plaintiff. The foxes are then pelted and the furs sold by an auction agency. Plaintiff's pelt sales for 1939, as reported by it in 1940 to the federal census bureau, were $200,558; and the total value of its farm was $87,685, of which $47,608 was for buildings and fixtures. The proportion of total value thus attributed to buildings and fixtures,—without including the value of its breeding foxes,—indicates a specialized investment and the use of capital for equipment far in excess of that found in the ordinary farm of like size. About forty-five per cent of the capital stock of the plaintiff corporation is owned by the Herbert Nieman Company. The Nieman group of fox farms, of which the plaintiff's farm is a unit, produces the largest amount of fox pelts in the United States. The bookkeeping records of the plaintiff's operations are kept by another corporation, which handles the work for seven other operating fox farms, and charges the proportionate expense back to plaintiff. In apportioning the cost of labor to the farm's various products, no one part or certain number of its employees is applied exclusively to the foxes.

At the times plaintiff paid the contributions which it seeks to have refunded, there was in effect, in substantially the same form, the provision in sec. 108.02 (e), Stats. 1935, that for the purposes of ch. 108, Stats., the term employment "shall not include: 1 Employment as a farm laborer." On August 2, 1934, the Industrial Commission, in endeavoring

to interpret the term "farm laborer," as used in that provision, created and made effective,—under the authority granted it by sec. 108.14 (2), Stats., to instrument the provisions of ch. 108 by appropriate rules,—Rule 10, which provided,—

*"Farm Laborers Exempted.* Only those persons employed on a farm in customary types of farm work or employed and paid directly by a farmer in transporting his raw produce shall be deemed 'farm laborers' under section 108.02 (e) 1 of the Wisconsin Statutes."

There does not appear to have been any controversy that resulted in a decision by the commission and a judicial review thereof to determine whether the employment of a laborer in performing services in the operation of a fox farm, as conducted by plaintiff, constituted "employment as a farm laborer" under the meaning of that term as used in sec. 108.02 (e), Stats. 1935. However, in *Eberlein v. Industrial Comm.* 237 Wis. 555, 297 N. W. 429, there was involved and decided the question as to whether fox farming, when separately pursued, constitutes farming within the meaning of the terms in sec. 102.04 (2), Stats., of the Workmen's Compensation Act, which reads,—

". . . The provisions of this subsection shall not apply to farmers or to farm labor. . . ."

In the *Eberlein Case* the employers' farm consisted of three hundred acres of land, most of which was devoted to general farming operations. A small portion was devoted to the raising of foxes and another portion to the raising of ginseng. An employee, who performed services in the general farming operations, but also spent some time working on the fox farm and also in the ginseng gardens, was injured while husking corn, and applied for compensation therefor under ch. 102, Stats. The commission held that there could be no separation of the three enterprises conducted on the farm; that the labor performed in the operation of the fox farm and of the ginseng gardens did not constitute "farm labor" within the meaning

of that term in sec. 102.04 (2), Stats.; that the employers could not remain under the compensation act for some farming and withdraw as to other farming, and although fox raising (and perhaps ginseng raising) might not be construed as "farming" if standing alone, they should be considered farming when carried on by farmers, as the employers otherwise were; and that therefore they and the injured employee were under the compensation act and he was entitled to the compensation. In an action brought to set aside the award, the court ordered judgment to that effect; and in affirming that judgment upon an appeal we said (p. 558),—

"It is pretty clear to us that fox farming, when separately pursued, is not farming within the meaning of the statute, and that one who raises foxes as a separate pursuit is not a farmer. Thus, if one should buy a small tract of land appropriate for the raising of foxes and engage in no other agricultural pursuits, he would have no election to stay out of the Workmen's Compensation Act. When the tools, the amount, and type of labor required, and the hazards of workmen, income, and investment are considered, he must be treated as engaged in an industry. . . . The same conclusion applies to the raising of ginseng if the situation be limited as above. In such a case the analogy to the operation of a hothouse is very close. Such activities are not farming as that term is commonly understood and as the legislature must have understood it when the act was drafted." (*Eberlein v. Industrial Comm., supra.*)

Those conclusions and the reasons therefor are likewise applicable in the case at bar to the fox-farming enterprise in which plaintiff was engaged, and to the Industrial Commission's determination that the employment of workers in the performing of services in plaintiff's conduct of that enterprise did not constitute "employment as a farm laborer." In this case, as we concluded in *Eberlein v. Industrial Comm., supra,* an employer conducting fox farming on the scale and in the manner in which plaintiff operated its fox-farming enterprise, with its proportionately large capital investment in specialized machinery and equipment, and labor and feed, as well as breed-

ing stock, can rightly be held to be engaged in an industry, and not in a customary type of farming as that term is ordinarily and commonly understood. In the absence of a definition or other express term to the contrary in sec. 108.02 (e), Stats., as to the intended meaning of the legislature in using the term "employment as a farm laborer," it was natural and proper for the commission in creating Rule 10 (above quoted) to interpret and conclude that term to mean "only those persons employed on a farm in customary types of farm work or employed and paid directly by a farmer in transporting his raw produce." Thus the commission rightly endeavored to define the term "farm laborer" by reference to its customary and ordinary usage; and attempted to distinguish the common and ordinary significance of the terms "farm" and "farm labor" from the specialized meanings thereof when, in exceptional and rare instances, the use of the word "farm" is extended to embrace such areas as a worm, rattlesnake, crocodile, or even oyster farm. These instances clearly are not within the common and ordinary usage of the term "farm." Substantially to the same effect as Rule 10, created by the Industrial Commission, is the United States Treasury Department's Regulation 90, article 206, by which the term "agricultural labor" used in the federal Social Security Act was defined (until an amendment of the act became effective on January 1, 1940) as labor "on a farm," and a "farm" was defined as embracing "the farm in the ordinarily accepted sense;" and in applying that definition the treasury department issued specific rulings holding that fur raising was not to be regarded as agricultural labor. Rulings to the same effect appear to have been made also under state Unemployment Compensation Acts.[1]

[1] Montana, C. C. H., Vol. 4, U. I. S. Montana, sec. 1365, p. 29025; Michigan, C. C. H., Vol. 4, U. I. S. Michigan, sec. 1365, p. 25040; Utah, C. C. H., Vol. 6, U. I. S. Utah, sec. 1365, p. 47029; Indiana, C. C. H., Vol. 3, U. I. S. Indiana, sec. 1365, p. 17036; Kentucky, C. C. H., Vol. 3, U. I. S. Kentucky, sec. 1365, p. 20029; California, C. C. H., Vol. 2, U. I. S. California, sec. 1365, p. 8067.

Those rulings and the commission's determination under review herein are in accord with the decision in *In re Bridges,* 287 N. Y. 782, 783, 40 N. E. (2d) 648, which appears to be the only case in which there was a determination by an appellate court of last resort as to whether or not workers engaged in fox-farming operations are included under the term "farm laborer," as used in a statute relating to unemployment compensation. That case was in relation to a claim for unemployment compensation allowed Bridges by the unemployment insurance appeal board of New York. He was employed by the owner of a forty-acre farm, on five acres of which there were pens to house and restrain three thousand fur-bearing animals, including foxes, mink, and raccoons. The remaining acreage was used for the maintenance of three cows, the milk of which, in part, was fed to the animals; and was also used to supply other types of food for them. During the summer months many of the animals were transferred to a smaller tract of land owned by the employer and exhibited there to paying visitors. The appeal board determined that the employer "did not conduct a farm and that claimant was not a farm laborer within the meaning of the Unemployment Insurance Law, Labor Law, sec. 500 *et seq.*" That determination and the allowance of the claim by the board was reversed by an order of the supreme court, appellate division (*In re Bridges,* 262 App. Div. 19, 28 N. Y. Supp. (2d) 312); but that order was, in turn, reversed and the appeal board's allowance of the claim was affirmed on an appeal to the court of appeals, which said (*per curiam*),—

"Under the provisions of the Labor Law (art. 18, sec. 502, chap. 468, L. 1935, as amended by chap. 117, L. 1936) the employer was not entitled to the exemption of the employee as a farm laborer."

The facts that the legislature in enacting ch. 372, Laws of 1939, amended sec. 108.02 (5) (g) 1, Stats. 1937, by substituting for the term "employment as a farm laborer," "em-

ployment in agricultural labor," and to define the latter enacted sec. 108.02 (23), Stats. 1939, so as to include under that term labor performed on a farm in "raising, . . . feeding, caring for . . . fur-bearing animals," do not warrant, as plaintiff contends, the conclusions (1) that by the use of the term "farm laborer" in sec. 108.02 (e), Stats. 1935, as originally enacted, and while that term continued to be in the statutes without an express definition thereof, it was the legislative intention to include thereunder laborers employed as fox-farm workers; (2) that by the amendments in 1939, substituting the term "agricultural labor" and defining that term, no change or enlargement in the meaning of the term "farm laborer" was intended to be affected; and (3) that those amendments were but indicative and interpretative of what the legislature meant in using in the original act the term "farm laborer." Conclusions to that effect in relation to similar provisions in the original statute and subsequent amendments in New York constituted, in part, the basis for the order in the *Bridges Case* (28 N. Y. Supp. (2d) 312) which, notwithstanding those conclusions, was reversed by the court of appeals as stated above.

In support of plaintiff's contentions in respect to the conclusions stated above, it relies largely upon the courts' conclusions in *United States v. Turner Turpentine Co.* (5th Cir.) 111 Fed. (2d) 400, and *Fromm Bros., Inc., v. United States* (D. C.), 35 Fed. Supp. 145 (which followed the decision in the *Turner Turpentine Co. Case*), that by the definition (enacted August 10, 1939) in subdiv. (1) of sec. 1607 (l), Internal Revenue Code, of the term "agricultural labor,"—as used in subsec. (c) (1) of sec. 1607 of the code—(53 U. S. Stats. at L. pp. 1392, 1396), it was defined in such manner so as to include thereunder also the raising of fur-bearing animals, and was merely interpretative and explanatory or a clarification of the term "agricultural labor" as used in the original Social Security Act of 1935. The courts' conclusions

in those respects were, however, held erroneous in *Chester C. Fosgate Co. v. United States* (5th Cir.), 125 Fed. (2d) 775, 777, in which the court said,—

"The company asserts that the amendment of the Social Security Act of August 10, 1939, states the meaning of 'agricultural labor' which should here be applied, it being a mere clarification of the original act, citing *United States v. Turner Turpentine Co*. 5 Cir., 111 F. (2d) 400. We think otherwise. . . . The amendment of 1939 was said to be interpretative and explanatory of the original act, but the statement must be limited to the matter before the court. A careful examination of the legislation and its history leads us to say that so far as it relates to the present case it was expressly intended to change existing law from a date fixed in the future, and was not declaratory of the old law and operative retroactively. The original Social Security Act of 1935, sec. 907 (c) (1), 49 Stats. 643, 42 U. S. C. A., sec. 1107 (c) (1), excepted from the basis of taxation wages for 'agricultural labor.' The very next section sec. 908, 42 U. S. C. A., sec. 1108, authorized the making of administrative regulations. Regulation 90 was promulgated, and article 206 (1), quoted in the margin, undertook to give a practical workable interpretation of what was to be treated as 'agricultural labor.' . . . The regulation stood until Jan. 1, 1940, and we suppose was enforced. On Feb. 10, 1939, congress enacted into law the Internal Revenue Code, including therein as section 1607, 26 U. S. C. A. Int. Rev. Code, sec. 1607, without change, section 907 of the Social Security Act; 53 Stats. p. 1. The same congress on Aug. 10, 1939, after elaborate consideration, made extensive amendments of the Social Security Act, including section 1607 of the Internal Revenue Code. This whole act is entitled one to amend, not to declare and explain the law. Section 614, 53 Stats. 1392, which deals specially with the matter before us, begins: 'Effective January 1, 1940, section 1607 of the Internal Revenue Code is amended to read as follows.' Subsection (l) then inserted makes the elaborate statement of what is and what is not agricultural labor which we are now asked to apply retroactively. Congress itself said it was not to apply until January 1, 1940. The report of the committee of the house which

handled the bill, and that of the senate, both speak of the 'old law,' stating it as Regulation 90 stated it, with evident recognition of the validity of the regulation, and state the changes that were intended; and the conference report emphasizes that the changes were to take effect only at a future date, so as not to affect pending litigation. We think the amendment of 1939 cannot be used to guide us; that the simple words 'agricultural labor' must stand as the sole statutory language; and that we should not overturn the interpretation of them in Regulation 90, art. 206, by which we suppose taxpayers generally have settled their taxes."

Those conclusions are in accord with the statement of the ways and means committee, in reporting the amendment for passage (H. R. No. 728, 76th Cong., 1st Sess., pp. 2, 18), that the committee—

"believes that greater exactness should be given to the exception and that it should be broadened to include as 'agricultural labor' certain services not at present exempt, as such services are an integral part of farming activities."

"The last sentence of the subsection [corresponding to par. (e) of 108.02 (23), Wis. Stats., as enacted by ch. 372, L. 1939] makes it clear that the term 'farm,' as used in this subsection has a broad and comprehensive meaning. The term, for example, includes fur-bearing animal farms. Under present law, services performed in connection with the operation of such farms constitute covered employment."

As workers on fur-bearing animal farms were considered to be within the coverage of the federal act because they were not included in the term "agricultural labor," as used in the act prior to the definition thereof created by the amendment effective January 1, 1940, such workers likewise cannot be considered to have been included in the term "farm laborer" (as used in sec. 108.02 (e), Stats. 1935), the meaning of which is not as broad and comprehensive as even the term "agricultural laborers." *Forsythe v. Village of Cooksville,* 356 Ill. 289, 190 N. E. 421; *Lowe v. N. D. Workmen's Compensation Bureau,* 66 N. D. 246, 264 N. W. 837; *Davis v.*

*Industrial Comm.* 59 Utah, 607, 206 Pac. 267, 268, 269; *Cook v. Massey,* 38 Idaho, 264, 220 Pac. 1088; *Carstens Packing Co. v. Industrial Accident Board,* — Idaho, —, 123 Pac. (2d) 1001, 1003; *Fleckles v. Hille,* 83 Ind. App. 715, 149 N. E. 915.

It follows that the Industrial Commission was warranted in concluding that the employment in question in the case at bar was not that of "farm laborers" as that term was defined for the purposes of ch. 108, Stats., prior to 1940.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment dismissing the complaint.