## Commonwealth v. Hanover Shoe Farms, Inc.

*David Stahl*, Attorney General, and *Richard H. Wagner*, *Albert D. Stuart*, *Ellen Marie Coggins* and *Louis F. DelDuca*, Assistant Attorney Generals, for Commonwealth.

*John McI. Smith*, *Nauman*, *Smith*, *Shissler & Hall* and *Edwin M. Buchen*, for defendant.

SHELLEY, J., July 17, 1961.—This is an appeal from the action of the board of finance and revenue and involves the interpretation of the Selective Sales and Use Tax Act of March 6, 1956 (1955), P.L. 1228, as amended 72 PS §3403.1 et seq.,[1] hereinafter referred to as "The Act". The appeal is based on an assessment by the Bureau of Sales and Use Tax. Appellant petitioned for a reassessment, claiming that there was no tax due from it because it was engaged in a farming and/or agriculture enterprise. If the taxpayer is so engaged, there would be no tax. The assessment involved resulted from an audit for a period beginning

---

[1] We consider the act and its amendments applicable to the period of time involved in this case.

on March 7, 1956, the effective date of the Selective Sales and Use Tax Act, supra, and September 30, 1958.

Under the provisions of the Act of April 22, 1874, P.L. 109, 12 PS §688, the parties have entered into a stipulation for the trial of this case without a jury.

The parties have also stipulated the facts. We adopt their stipulation as our findings of fact and incorporate the same herein by reference. In the course of our opinion we will discuss those facts which, in our judgment, are essential to the disposition of this case.

During the period involved, appellant owned or leased approximately 2,000 acres of land, which was utilized for the purpose of grazing and exercising standardbred horses[2] which were kept on the land. The present horse population is about 800. Appellant has utilized its land solely for the aforesaid purpose, having discontinued, since the year 1953, the raising of crops on the land. Since 1953, appellant procures the feed and bedding supplies for the horse population from local farmers or elsewhere.

Appellant, in addition to breeding its own mares and stallions, provides, for a consideration, the breeding of standardbred mares owned by others. Appellant makes available to the owner of a given mare a specified stallion for the purpose of breeding the mare. Appellant also leases stallions from other owners and the arrangement for breeding is substantially similar, with a division of the "stud" or breeding fee between appellant and the lessor of the stallion. The breeding fee is due and payable by the owner of the mare either at the time the bred mare is removed from appellant's premises or when a live foal is produced, whichever occurs first, and should the mare be removed prior to the birth of the foal and later the foal is "stillborn", the mare aborts or for some other reason no live foal

---

[2] Standardbred horses are horses used for harness racing.

results, appellant refunds the "stud" or breeding fee. For a stated additional consideration, appellant provides board, keep and veterinary care for the mare. Appellant also breeds its own mares to the stallions leased from others, in which event appellant pays the owner of the stallion one-half of the normal breeding charge. The situs of the breeding referred to above is appellant's place of business located in or near Hanover, York County, Pa. The business enterprise of raising, breeding and selling standardbred horses has grown to be one of considerable proportion.

With respect to the breeding of the standardbred horse, a factor determining the amount of the breeding fee (referred to in the trade as the "stud fee" or "service fee") is the racing success of a given horse as reflected by the total purse won by said horse. The racing records and winnings of horses in the ancestral line of the stallion are factors which determine their respective breeding desirability.

The primary question involved in this case is whether appellant is engaged in a farming and/or agricultural enterprise within the meaning of those terms as used in the act.

The assessment of the tax by the Commonwealth is based on its contention that the raising and breeding of standardbred horses is not farming or agriculture engaged in as a business enterprise by appellant.

The act was passed, as its title indicates, to provide revenue for the purposes of public education, the cost of which has risen considerably in recent years. The tax is a broad-based one and is levied generally on sales at retail from which only certain sales are exempt: Commonwealth v. Donovan Company, 76 Dauph. 191, 199 (1960).

The act imposes a tax upon each separate sale at retail as defined therein within the Commonwealth and

also upon the use within the Commonwealth of tangible personal property purchased at retail. Certain specified categories of tangible personal property are excluded or exempted from the tax. Sale at retail is defined in section 2(j) of the act as follows:

"Any transfer, for a consideration, of the ownership, custody or possession of tangible personal property, including the grant of a license to use or consume whether such transfer be absolute or conditional and by whatsoever means the same shall have been effected. ... (7) ... The term 'sale at retail' shall not include (a) any such transfer ... for the purpose of resale, or (b) ... the transfer of tangible personal property including, but not limited to, machinery and equipment and parts ... and supplies to be used or consumed directly in ...

(2) Farming, dairying, agriculture, horticulture or floriculture when engaged in as a business enterprise; ..."

It is well settled in Pennsylvania that tax statutes must be strictly construed and any doubt should be resolved against the government and in favor of the citizens. The principle that taxing statutes are to be narrowly and strictly construed has been made a part of the statutory law in Pennsylvania, Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, paragraph 58 (3) ; 46 PS §558(3). However, the principle has a considerably older history. For years it has found sanction in decisional law not only in Pennsylvania but in many other jurisdictions as well: Gould v. Gould, 245 U.S. 151, 153 (1917) ; United States v. Merriam, 263 U.S. 179, 187, 188 (1923). In Pennsylvania our courts have given expression to the principle of strict construction in connection with a great variety of tax statutes: Commonwealth v. Pennsylvania Water & Power Company, 271 Pa. 456, 458, 459

(1921) ; Paper Products Company v. Pittsburgh, 391 Pa. 87 (1958) ; Fischer v. Pittsburgh, 383 Pa. 138 (1955) ; Commonwealth v. Westinghouse Electric Corporation, 65 Dauph. 60 (1953) ; Callery's Appeal, 272 Pa. 255 (1922) ; Commonwealth v. Phila. Rapid Transit 287 Pa. 190 (1926) ; Husband's Estate, 316 Pa. 361, 369 (1934) ; Dorrance's Estate, 333 Pa. 162, 171 (1939) ; Arbuckle's Estate, 324 Pa. 501, 505 (1936).

It is equally well settled in Pennsylvania that if the power to tax exists and the taxpayer is within the general language of the statute or ordinance imposing the tax, all provisions relied upon to establish an exemption from the tax should be strictly construed against the claim for exemption: Fischer v. Pittsburgh, supra.

In determining legislative intent as to the construction or provisions of a tax statute, the court should rely on substance rather than form. The United States Supreme Court has said that in determining whether these taxes violated the government's constitutional immunity, we must look through form and behind labels to substance: City of Detroit v. Murray Corporation of America, 355 U.S. 489 (1958). The rules of construction which we have applied to determine the legislative intent of the provisions for tax relief in this act are all in accord with the sound principle that substance rather than labels, technicality and supposition shall determine the rule of construction to be applied.

The act provides that sale at retail shall not include farming, dairying, agriculture, horticulture or floriculture when engaged in as a business enterprise. Since there is no suggestion that appellant is engaged in dairying, horticulture or floriculture, we will confine our consideration as to whether or not appellant is engaged in a farming and/or agriculture enterprise.

The act uses the words farming and agriculture without defining them. It has long been recognized in Pennsylvania that where words are not defined in a statute, they are presumed to be used in their popular sense: Commonwealth v. Bay State Milling Co., 312 Pa. 28 (1933). The legislature is presumed to have intended that words used in a statute shall be construed according to their common and approved uses: In re Commonwealth Trust Company General Mortgage Investment Fund Case, 357 Pa. 349 (1947); section 33 of the Statutory Construction Act, supra, 46 PS §533.

The words farming and agriculture are defined in Webster's New International Dictionary (2d ed.) as follows:

"Farming: . . . Act or business of cultivating land; the conduct or management of a farm."

"Agriculture: The art or science of cultivating the ground, and raising and harvesting crops, often including also feeding, breeding, and management of livestock; tillage; husbandry; farming; in a broader sense, the science and art of the production of plants and animals useful to man, including to a variable extent the preparation of these products for man's use and their disposal by marketing or otherwise. In this broad use it includes farming, horticulture, forestry, dairying, sugar making, etc."

The above dictionary definitions contain not only the popular meanings, but the generic meanings of such words as well. It is obvious that although the popular meaning of a word may often be its complete or generic meaning, the popular meaning of a word may be only one of several meanings comprising the generic meaning.

The earliest reference in Pennsylvania case law on the subject we can find is in Commonwealth v. Carmalt, 2 Binney 235, 238 (1810), where the court said:

"By a farm we mean an indefinite quantity of land, some of which is cultivated."

Farming is the commercial production of any plant (even horticulture) or annual which has economic value: Commonwealth v. Przychodski, 177 Pa. Superior Ct. 203, 207 (1955). The dominant and distinguishing characteristic of farming in both the popular and legal sense of the term is the cultivation of the soil for the production of crops therefrom: Chudnov v. Board of Appeals, 154 Atl. 161, 162 (Conn.) (1931). Farming implies that the operator is dealing with the natural production of the soil in a natural manner: Dye v. McIntyre Floral Co., 176 Tenn. 527, 144 S. W. 2d 752-753 (1940). It is the cultivating of land: Sohner v. Mason, 288 P. 2d 616, 617 (Cal. App.) (1955).

The term agriculture is much more inclusive and in its broader sense includes farming, horticulture, forestry, dairying, sugar making, etc.: Hardy v. Gapen, 141 Pa. Superior Ct. 101, 104 (1940). It was held in Springer v. Lewis, 22 Pa. 191-93 (1853), that under a law which exempts a horse, harness and plow (when owned by a person actually engaged in the science of agriculture), a person is actually engaged in the science of agriculture when he derives the support of himself and family in whole or in part from the tillage and cultivation of fields. It was said in Warner v. Longstreth, 108 Pa. Superior Ct. 124, 126 (1933), that " 'agriculture' covers all things ordinarily done by the farmer and his servants incidental to the carrying on of his branch of industry".

The terms farming and agriculture have always been associated with the cultivation of the soil and raising of animals which have some relationship to the cultivation of the soil or uses in fulfilling man's basic needs. It was held in Spohn v. Brown, 26 D. & C. 534, 537 (1936):

". . . In popular meaning one is engaged in agriculture when his occupation is tilling the soil and raising crops. Whatever else may be incidental, the criterion is the cultivation of the soil and the harvesting of seasonal products. Such a one usually rears, feeds, and obtains the natural products of 'livestock', but such livestock are domestic animals only, in their very nature an incident to the cultivation of and the raising of crops from the soil of their environment and obtaining their sustenance directly from and fertilizing that soil and its plant products . . ."

Thus, the raising of corn, wheat, and other food crops, and also the tilling of the soil to produce tobacco and cotton and the like would be considered agriculture. The raising of animals useful to man as food or for use in the tilling of the soil would be farming. However, the mere raising of any kind of animal for profit, even a domesticated animal, would not necessarily constitute farming. For example, the breeding and raising of dogs and cats would not constitute farming even though they be domesticated animals.

Standardbred horses fill no basic need of man. It is common knowledge that the breeding and raising of standardbred horses is one producing a luxury product and not a product ordinarily considered necessary to man's needs; standardbred horses have no relation to the land except to occupy it, and the fact that they produce waste used to fertilize the soil is in the nature of all living creatures.

Farming, as it is ordinarily and naturally understood, does not include the raising of foxes, mink, pigs, game animals, fighting cocks, worms, rattlesnakes or crocodiles, regardless of whether or not the locality where the activity takes place is called a farm (Cedarburg Fox Farms, Inc. v. Industrial Commission, 241 Wis. 604, 6 N. W. 2d 687 (1942) ) and those so em-

ployed cannot be said to be engaged in farming and/or agriculture enterprise.

It was held in the case of Whitpain Township v. Bodine, 372 Pa. 509 (1953), that the raising of pigs entirely for commercial purposes and not for consumption by the owner does not come within the term "farming." In this case, a zoning ordinance provided that " 'No piggery . . . will be permitted within the residential district of this township.' " Defendant, a resident of New Jersey, owned approximately 67 acres of land in the township, which land the ordinance placed in the highest classification for residential purposes. There were on the land a farm house which was rented as a dwelling, a garage apartment in which defendant's caretaker resided, a barn, cow shed, pig pens and runs. The livestock consisted of some chickens and ducks, two steers and two horses. Some grains were raised on the lands, most of which, if not all, was used as feed for the pigs. This feed was supplemented by commercial protein feed and fermented grain which was a waste or refuse product of appellant's brewery in New Jersey. The number of pigs varied and at times there were as many as 600. The pigs were kept in pens and two breeding lots; the sows were bred and the young kept until eight weeks old and then were removed or sold. Defendant argued that it was a farm and not a piggery and that since he was not proceeded against for a nuisance, such use should not be enjoined.

The court said at page 511:

" '. . . the overwhelming and predominant purpose of the tract is for the raising of pigs . . . [which] are raised entirely for commercial purposes and not for consumption by the owner; the property is farmed for the pigs and the pigs are not raised as part of the farming'; . . ."

The status of the horse in relation to man has changed considerably in the twentieth century. Time

was when man depended to a very large extent upon the horse for the cultivation of his land and for his transportation. Mechanical devices have replaced the horse in this respect. The use of horse to man was not limited on the farm to work but the excrement of horses was used along with that of other livestock almost exclusively for the fertilizing of the soil. That use of the horse to the farmer in this respect has been replaced by commercial fertilizers. The importance of the horse to man before the mechanical age is indicated by their exemption under homestead acts and sale under judicial execution, and the stealing of a man's horse was placed in the same category as murder. In the mechanical age in which we live, the use of the horse has become that of recreation and sport, including racing and exhibiting.

We have considered the case of Van Clief v. Comptroller of State of Maryland, 211 Md. 191, 126 A. 2d 865 (1956), upon which appellant depends to some extent to sustain its position. That case is distinguishable. It had to do with a statute providing exemption from sales tax for sale of livestock "used for agricultural purposes". A brood mare which had been formerly used as a racing mare but which was kept for the purpose of producing colts to be used as race horses was exempted from the sales tax because it was livestock "used for agricultural purposes". In that case, the breeding of one mare was a sideline to the principle activity of farming. In the instant case there is no activity that could be classified as farming. As a matter of fact, in 1953 the raising of crops was entirely abandoned by appellant.

Under the act, the ultimate use and purpose of tangible property must be considered in a very real sense a substantial part of the scheme of tax relief and the act depends upon the purpose and uses a purchaser will make of the "tangible personal property". In

essence, the activity of appellant is as inexorably linked to harness racing as is the manufacturer of the sulky and the builder of the race track, for without the horses all of the branches of the industry would wither and die.

Since 1953, appellant has been engaged in the breeding of horses to be used in racing activities with only an incidental use of land necessary for such use. We cannot conclude that because of this incidental use of land, appellant is engaged in agriculture.

The sale of standardbred horses whose use and purpose are to engage in harness racing and the supplies, food and equipment used, are within the scope of the tax unless exempted therefrom by some provision of the act and we can find no such provision.

Appellant contends that its breeding of the mares of its customers for a "stud fee" is not a transfer of tangible personal property for a consideration. It is unnecessary, in our opinion, to engage in a metaphysical discussion regarding the nature or property of "life" created by the breeding process. We are not concerned with the mere act of breeding. The problem is whether seminal fluid from a specific stallion is tangible personal property.

It is common knowledge that the act or process of breeding an animal is essentially the insemination of the female reproductive tract. By whatsoever means this is accomplished, it is a transfer of semen derived from the male animal owned or furnished by appellant to a female animal owned by another person. This transfer can be accomplished either by natural means, i.e. sexual intercourse, or by manual injection. Whichever of the means used, there must be a transfer of the semen from the male animal to the female animal.

Under the facts as developed in this proceeding, seminal fluid is tangible personal property and is the subject of ownership. It has distinctive physical quali-

ties which can be touched, felt or otherwise observed by the senses.[3]

The monetary value of semen fluid depends upon the character and ancestry of the animal by which it is produced. It is tangible personal property under either of two provisions of section 2(1) of the Act defining the terms as:

"(5) Business, industrial, professional and commercial supplies, . . .

"(15) Live animals, fish and birds (except when purchased as food for human consumption) and supplies, food and equipment used in connection therewith;"

It is hard to conceive of a more vital and valuable commercial "supply" in the business of raising pedigreed animals or the business of breeding female animals for a charge than the semen of high grade sires. It follows that the transaction whereby the semen is furnished or implanted in the female is a "sale at retail" within the meaning of the Act, since section 2 defines that term, for purposes of the tax, as:

"(j) 'Sale at Retail':

(1) Any transfer for a consideration of ownership, custody or possession of tangible personal property . . . whether such transfer be absolute or conditional and by whatsoever means the same shall have been effected."

It is immaterial, therefore, whether the semen is furnished by the supplier (1) manually by (a) delivering

---

[3] Other notable examples of substances derived from animal glands and commonly sold as commercial supplies are thyroid, which is obtained from the thyroid glands, and hormones which are formed in various glands of animals. "Both male and female hormones are produced by both sexes; in fact, one of the richest sources of female hormone—one used commercially—is the urine of stallions." Claude A. Villee, "Biology", 3rd ed. (1957), p. 396. Perhaps the most common example is milk, which is a secretion of the mammary glands.

it to the customer who then implants it, or (b) by injection by the supplier into the customer's animal, or (2) by direct injection by the supplier's animal through the act of copulation, or (3) by a combination of these methods. In any of these circumstances, there is a transfer of valuable tangible personal property for a consideration as provided in section 2(j) of the act.

That the transactions above-described are accompanied by appellant's assurance that the customers' mare will be effectively impregnated, and by the further provision that if no live foal results, any breeding charge will be abated or refunded, does not detract from the fundamental and essential elements of the transactions, or their status as "sales at retail" within the meaning of the act.[4] Such assurances or warranties are common to sales contracts and, under the act, are part of the consideration or "purchase price" involved in a sale at retail. We said in Commonwealth v. McHugh, 75 Dauph. 68, 81 (1960):

". . . 'consideration' in §2(j) ['sale at retail'], we believe, is equivalent in meaning to 'purchase at retail' in §2(e), and 'purchase price' in §2(f)."

Section 2(f), in defining "Purchase Price" provides:

" 'Purchase Price'. (1) The total value of anything paid or delivered, or promised to be paid or delivered, whether it be money or otherwise, in complete performance of a sale, lease or purchase at retail of tangible personal property without any deduction on account of

---

[4] ". . . A legislative body may, in a statute or ordinance, furnish its own definitions of words and phrases used therein in order to guide and direct judicial determination of the intendments of the legislation although such definitions may be different from ordinary usage; it may create its own dictionary to be applied to the particular law or ordinance in question . . .": Sterling v. Philadelphia, 378 Pa. 538, 542 (1954). In the instant case, the transactions in question are not only "sales at retail" within the broad definition of the act; transfers of seminal fluid for a consideration for the customers' use are clearly retail sales in the common ordinary sense of the term.

the cost or value of the property sold, cost or value of transportation, cost or value of labor or service, interest or discount paid or allowed after the sale is consummated or any other expense, but excluding the value of the following: (i) returnable containers; (ii) labor or service cost in delivering or warranting the property sold if the consideration therefor is stated separately from the consideration paid for the property. . . ."

Clearly, it is immaterial to the nature of the sales transaction that the customers' mare may remain in the custody or possession of appellant while the transfer is made. There are many common sales transactions where the property which is the subject of the sale is transferred to a chattel owned by the purchaser while in the possession of the vendor. This occurs every day in the lubrication and repair of automobiles and other equipment which has been taken to the establishment of the vendor where the lubricants and parts are placed in or upon the purchaser's chattel. The same is true where portable or mobile tanks or other conveyances are filled with personal property sold, and thereby delivered, to the purchaser while the same are temporarily in the possession, or at least in the custody, of the vendor. In all such instances, a "sale at retail" is effected for purposes of the tax.

It is equally immaterial whether appellant is the owner or lessee of the stallions used for breeding purposes.

We conclude, therefore, that the enterprise of appellant does not come within the definition of "farming, dairying, agriculture, horticulture or floriculture when engaged in as a business enterprise." Appellant is therefore liable to the Commonwealth for tax in the amount of $22,591.01 and interest to date in the amount of $5,316.58, and judgment for the Commonwealth and against appellant in the amount of $27,907.59 must be entered in favor of the Commonwealth and against appellant. Since there was no testimony to the con-

trary, we conclude that appellant in these proceedings has acted in good faith, without negligence and with no intent to defraud and, therefore, there should be no additions or penalties assessed against it.

We, therefore, make the following

### Conclusions of Law

1. Appellant is not engaged in the operation of farming, dairying, agriculture, horticulture or floriculture as a business enterprise.

2. Seminal fluid from a specific stallion is tangible personal property.

3. The Commonwealth is entitled to judgment for the Selective Sales and Use Tax for a period from March 7, 1956, to September 30, 1958, both inclusive, in the sum of $22,591.01 and interest to date in the amount of $5,316.58.

4. Appellant has acted in good faith, without negligence and with no intent to defraud and there should be no additions or penalties assessed against it.

We, therefore, make the following

### Order

And now, July 17, 1961, it is ordered and decreed that judgment be entered in favor of the Commonwealth and against appellant, Hanover Shoe Farms, Inc., in the sum of $27,907.59, which includes interest to date, unless exceptions thereto be filed within 30 days as provided by law. The prothonotary shall notify the parties or their counsel of this decree forthwith. Costs of the appeal to be paid by appellant.

### Opinion Sur Exceptions

SHELLEY, J., January 2, 1962.—This matter comes before us on defendant's exceptions to our opinion filed on July 17, 1961. Defendant appealed from the action of the board of finance and revenue. The appeal involves the interpretation of the Selective Sales and Use Tax Act of March 6, 1956 (1955), P. L. 1228, as

amended, 72 PS §3403 et seq., and is based on an assessment by the Bureau of Sales and Use Tax. Appellant petitioned for a reassessment, claiming that there was no tax due from it because it was engaged in a farming and/or agriculture enterprise. If the taxpayer is so engaged, there would be no tax. The assessment involved resulted from an audit for a period beginning on March 7, 1956, the effective date of the Selective Sales and Use Tax Act, supra, and September 30, 1958.

Under the provisions of the Act of April 22, 1874, P. L. 109, 12 PS §688, the parties entered into a stipulation for the trial of this case without a jury.

In our opinion filed July 17, 1961, we discussed at length the issues involved in these proceedings and gave reasons for our findings and conclusions, and entered the following order:

"And now, July 17, 1961, it is ordered and decreed that judgment be entered in favor of the Commonwealth and against appellant, Hanover Shoe Farms, Inc. in the sum of $27,907.59, which includes interest to date, unless exceptions thereto be filed within 30 days as provided by law. The prothonotary shall notify the parties or their counsel of this decree forthwith. Costs of the appeal to be paid by appellant."

After argument on the exceptions before the court en banc, we conclude that the exceptions must be overruled and judgment be entered for the Commonwealth.

Since we, in our opinion, have reviewed the authorities which we believe are controlling in this matter, it would serve no useful purpose to reiterate what has already been said . We do, however, take occasion to point out that we rest our determination in this matter on our opinion. Since the history of the case, the findings of fact and conclusions of law are set forth in detail in our opinion, no useful purpose would be served by including them seriatim in this opinion. We have

examined the entire record, paying particular attention to the facts excepted to by defendant. The conclusions of law which we made in our opinion appear to be adequately supported by the facts. We can find no reason to alter our opinion and order.

We note among the exceptions to our conclusions of law that defendant objects to our second conclusion, which is:

"2. Seminal fluid from a specific stallion is tangible personal property."

Defendant contends that, since at the administrative level the theory of taxability of the breeding fees was the "granting of a license to use tangible personal property," the Commonwealth is limited strictly to this concept of the transaction in this appeal. Defendant argues that the Commonwealth is "raising a question on appeal without having given the notice required by Section 1104 of the Fiscal Code" in advance of the trial of this case. With this contention we cannot agree.

Defendant overlooks its own specification of objections. Specification of objection no. 4(e) which reads "(e) At no time during the entire transactions do the stallions of Defendant pass into custody, possession or control of the owners of the mares." challenges the theory that the breeding fees are taxable as the granting of a license to use tangible personal property.

Specification of objection no. 5(d) states:

"(d) The transmission of life from male to female cannot be felt or touched by a third party . . . Breeding has no physical substance which would bring it within the ordinary connotation of tangible personal property."

Under any reasonable construction of paragraphs 4(e) and 5(d) of defendant's specification of objections, defendant is proceeding upon dual or alternative grounds in objecting to the Commonwealth's assessment. If defendant did not seek to raise the question

of what physical substance, if any, is transferred in the breeding process (apart from a transfer of a license to use the male animal), then there was no purpose for specification no. 5(d). Defendant has taken the position from the very outset of its appeal that no physical substance is transferred in the process of breeding. Since defendant raised the question, it cannot now be permitted to rely on section 1104 of the Fiscal Code to contend that a new issue has been interjected without notice.

In view of the foregoing, we dismiss all of defendant's exceptions, including the supplementary exception which is an amendment to exception 17(d), and adopt as our final decree the order made on July 17, 1961.

### Final Decree

And now, January 2, 1962, the exceptions of defendant are herewith severally overruled and final decree is entered in this case in accordance with our order made on July 17, 1961. The prothonotary is directed to notify the parties or their counsel of this decree forthwith.

### Order

And now, January 2, 1962, defendant's motion for amendments to specification of appeal is overruled, without prejudice.